The next case, number 22-1074, Peter A. Gottlieb v. Amica Mutual Insurance Company. At this time, would Attorney Chavez please come to the podium and introduce himself on the record to begin? Good morning. Good morning. May it please the Court, I'm Attorney John Peter Chavez. I represent the plaintiff appellant, Peter Gottlieb, and I'd like to reserve three minutes. You may. In a nutshell, this case is about whether or not Amica Mutual Insurance Company overcharged the plaintiff, Peter Gottlieb, for homeowner's insurance. The facts are very simple, and I think they're mostly indisputed. In March of 2015, Mr. Gottlieb purchased the homeowner's insurance policy from Amica. That policy included a rider, which basically contained a provision saying that if Mr. Gottlieb would consent to letting Amica do the property evaluation, which is important because the evaluation determines the reconstruction cost for his dwelling, which is the biggest thing you're insuring against with a homeowner's policy, and if the house was destroyed, that's what it would cost to replace it. But it's just an estimate. Well, it is an estimate. That's correct, Your Honor. And if the cost had gone over that, the policy would have covered it. I'm sorry, I didn't catch that. If the cost of reconstruction would have gone over the estimate, the policy would still cover it. Well, the policy would cover it because the rider allowed for a 30 percent overage beyond the estimate of the reconstruction cost. So, again, what Amica says to Mr. Gottlieb and what Mr. Gottlieb accepted was, we will give you a 30 percent cushion above your reconstruction cost as long as you let us estimate it and as long as you let us add inflation to our estimate, basically. The first policy year from March of 2015 to 2016 passed, nothing of great note as far as this case is concerned. In March of 2016, Mr. Gottlieb went to renew his policy. The policy he received for the second year was basically identical to the policy he had for the first year for the purposes of our case. It had the same rider and the rider had the same provision saying that as long as you let us use our estimate, we will give you that 30 percent overage. Mr. Gottlieb accepted that offer. At that time, Amica did not conduct a second property evaluation. So the only property evaluation that existed in this universe was the first one done back in March of 2015. When the second policy for the second year came, didn't it have in it the higher evaluation? Yes, it did. So was he under any obligation to go with Amica for year two? No, he was not. And were they under any obligation to give him a policy for year two? No, they were not. So it seems to me we have a new contract for year two in which he knows the valuation they're placing on his house and he can agree to it or not agree to it by signing up with the contract. And then once he signs up, if they want to make any changes in the valuation, the policy addresses the limitations on their ability to do that. But that new contract could have been for any price, couldn't it? No, it could not have been for any price, Your Honor, because the terms of the second contract said that they could only use their own property evaluation. But where is it? I understand why that might be limited during the 12 months in which the policy was in effect. But what language do you rely on that you're in effect saying that and if we enter into a new contract with you for another year, the original price that we would place at the beginning of that contract can only be set in this way? No, that's half true, Your Honor. At the beginning of the second contract, Amica had two choices. Amica could have re-evaluated his property and come up with a new number for his reconstruction costs. What limited his choices? Couldn't it have just said, I don't want to insure you? Well, I mean, it had two choices to make him an offer for what they would insure him for. Right, they could have walked away, he could have walked away. It seems odd to say they could have walked away, not offered him a policy, and yet if they decided to offer a policy, it had to be for certain. The way the house value was set had to be pursuant to a now expiring policy. But, Your Honor, the exact same language was in the second policy. So again, under the terms of the second policy, Amica could have done one of two things, assuming they were going to make an offer to him. Number one, they could have said, we're going to do a new property evaluation and come up with a new number, or number two Let me try it this way, go back to the first policy. Okay. When they first met, never seen each other before, Amica has a value in for the house. Correct. It could pick that value any way it wanted. Well, it had to do a property evaluation, so I mean Right, what obligation did it have to do a property evaluation? That's what it said in the rider. No, I'm talking about the first policy. The first policy has the same rider. I mean, I mean Doesn't that address how they want to change the original amount? Well, in the second policy, the rider says, which is the same as what it says in the first one, is that you have to allow us to use our property evaluation, right, and the only property evaluation is the one that goes back to March of 2015, and you have to allow us to adjust for inflation. And inflation is that period of time from the last policy evaluation until the new policy. So hypothetically, for example, let's say that Mr. Gottlieb had shown interest in a policy and Amica had done the property evaluation, and for whatever reason Mr. Gottlieb had not taken that first policy. But then at the end of the year, March of 2016, he says, you know what, I'm going to change my mind. I'm going to get an Amica policy. So he could have went back to Amica, and Amica, under the terms of their own contract, could have said, we're going to give you a new policy, a new property evaluation, or, you know what, we did one a year ago, so we're going to use the one from a year ago, and we're just going to adjust it for inflation. How are you saying the first property evaluation was done? It was done through, I believe, a computerized service and then someone that they hire who goes around and does an outside inspection of the house. Counsel, I'm just not getting at all where you, on what basis you conclude that Amica was constrained by any contractual obligation to use a particular property evaluation method in offering the renewal policy to your client. I think Judge Kayada was trying to get at that, and I did not hear an answer to his question. Are you suggesting that the 2015-2016 policy as a contractual matter required them to do a particular type of property evaluation in proposing the new policy? Is that your argument? No, Your Honor. Our argument is that we accept the 2015 property evaluation, and we say that in the second policy, 2016-2017, because they did not do a second property evaluation, they had to use the first one under the terms of their own contract. Are you saying that they had to do a walkabout for the second contract? No, Your Honor. I'm saying that they could use the first one, the first evaluation for the second contract, and then they could adjust it for inflation. But what are you pointing to as to why they were compelled to do it that way when the second one is a completely new contract? Because they had to do it that way on the facts in this case because their first property evaluation was the only one they ever did. But suppose at the time of the second one they offered them a policy but without the endorsement? Then arguably he might have had to, somebody would have had to come up with a property evaluation. Just their original coverage limit, coverage A limit under the policy, having a declaration, don't you put in the declaration the property limit? Well, the property limit, yes, is in the declaration. Right. So they had no, they just go with the declaration coverage limit A and no endorsement regarding adjustment. Couldn't they have done that? Well, I mean, in theory they could have, Your Honor, but this is an approved policy by the Massachusetts Division of Insurance and they just can't randomly take pieces in and out of it without the division's approval. Counsel, I don't, again, I don't understand why the endorsement has anything to do with this case. In this sense, it only describes the way in which a property evaluation has to be done within the policy period. By its terms, it has nothing to do with how AMICA should approach offering a renewal policy to your client. So the endorsement seems, for that reason, quite irrelevant. It simply does not constrain AMICA that I can see it anyway when it proposes this renewal policy. Well, Your Honor, I would just suggest that you go back and take a look at the rider of the second policy because, again, the rider says that AMICA is going to make a determination based on its property evaluation. The only property evaluation it's ever done was in the early year, March of 2015, and inflation. But does it actually say that? It says if you have allowed us to adjust the coverage limit, the coverage A limit. Right. The rider seems to suggest, the endorsement seems to suggest that there is a coverage A limit and now we're going to address adjusting that. And the rider regulates the adjustment of it. But what about the setting of it in the first instance? It doesn't seem that the rider addresses the setting of coverage A limit in the first instance. Your Honor, the adjusting the coverage limit is the 30 percent cushion that they give you. That is the adjustment. That is what the policyholder gets out of the rider. Sure, but how do you set, what language in the policy regulates the setting of coverage A limit? The base coverage. It's in the rider, Your Honor. I don't see, what language in the rider says, I see it refers to adjusting it, but what about setting it? I'm looking at record site 0146. If you have allowed us to adjust the coverage limit of liability in accordance with the property valuations we make. We're looking at the same thing. Okay. I'm just having trouble understanding how you can adjust something if it doesn't already exist pre-adjustment. Because the adjustment is just the percentage, Your Honor, so it doesn't matter. Whatever the other number is, the adjustment is just 30 percent. Right, so you have to have some other number, though, to adjust. Right, so. And what regulates the setting of that number? What regulates it is their own language. The property valuations we make and any increases in inflation. That's all right. So, counsel, if we do not agree with your contractual argument, I guess you would say, well, you still have an unjust enrichment argument and a Chapter 93 argument that are independent of your contractual claims. Is that how you view it? Those are entirely distinct claims, not dependent upon any contractual constraints on AMICA? Well, I mean, the 93A claim is based on the simple proposition that they misrepresented how much coverage Mr. Gottlieb was actually receiving because they told him in the second policy, if you look at the initial page, that he's entitled to $321,000 worth of reconstruction cost. But if you do the math of what the original estimate of his reconstruction cost was, with what the actual inflation was, that number is smaller than $321,000. So they charged him for $321,000 worth of replacement cost, but his actual replacement costs were less because it would have cost less, using their analysis, to actually replace his house if it had burned down. So they say there's no evidence in the record. I mean, you insist that he was purchasing illusory coverage because the actual replacement cost would never reach $321,000. Is there any evidence in the record as to what that actual replacement cost would have been, which you insist is less than $321,000? Is there any evidence in the record? Well, Your Honor, the evidence is from AMICA. Number one, we used their estimate. And number two, we used what we considered to be the correct rate of inflation. And number three, we pointed out that AMICA reported a rate of inflation for the relevant time period of 1% when it sought a filing change with the Mass. Division of Insurance, but actually they charged Peter Gottlieb 3.1%. So they basically charged him triple what they claimed had been the inflation rate for that relevant period of time. So again, if you accept that their first estimate is correct, if they overstate inflation, then the second number is going to be overstated. And because you can't ever get any more from your coverage than what you actually spend to reconstruct your house, whatever amount of coverage above that is illusory and you're never going to use it. And to the extent that it's something that should be estimated because we can't be known with precision, that's precisely the point of this rider, which gives you a 30% overage. So there's no need to charge him extra for coverage in that base number on the theory that he might need it because prices might go up or whatever. Thank you. Thank you. Thank you. Thank you, Mr. Zabez. At this time, Attorney Riley, please introduce yourself on the record to begin. Good morning, Your Honors. Chris Riley and with me my fellow partner, Laura Gregory. Your Honors are correct that the policies, the terms of the policies, don't govern how renewal policy coverage day limits can be calculated. The endorsement they're referring to, there was no contract until Mr. Gottlieb accepted the first policy, the 2015 to 2016 policy. There was no contract with an endorsement for the 2016-17 policy until that separate contract was accepted. The endorsement, the purpose of it is, AMICA offers an endorsement that says if you have a loss, we'll give you 130% of the limit that we've provided because there are things that can happen, latent problems, that you can't know about until you're rebuilding your house. In exchange for that, if during the policy year, we become aware that the limit of $311,000 or the limit of $321,000 is unreasonably low because you, for instance, build an addition on your home or some other, we send out an exterior inspector to look at the house and find out the value should be more. Or, well, we want to be able to adjust that coverage day limit and increase it if we have to. That didn't happen here, obviously. With respect to the way, I just want to clarify the timing on when the inspection of the property happened to, Mr. Gottlieb here called AMICA on March 9th and said, I need a policy on March 10th, and described his home, described the square footage, the basement was finished, the furnishes in the home, and AMICA said, okay, here's our current evaluation of your home. We're going to send you an application that lays all those things out. You take a look at it. He signed it. He sent it back. After that, AMICA sent out a third party to take an exterior look at the property. And, for instance, in that scenario, if they had identified that he hadn't told them about an extra room on the home, perhaps they would have had to adjust that coverage day limit, but that didn't happen in that case. All of the claims are premised on that theory. All of the claims, if you look at the complaint, the plaintiff's claims are all premised on the theory that the endorsement and the 15-16 policy somehow governs AMICA's ability to issue a renewal policy with a different limit. And the other argument, which I don't fully follow, is that somehow the endorsement in the 16-17 policy governs the ability of AMICA to offer a policy with an increased limit before that policy is agreed to. Can you get the policy without the endorsement? Yes, you can, although there's no premium charged for the endorsement, so most people choose to have the endorsement, but you can get the policy without the endorsement. The other overarching issue, which was touched on, is assuming that there was some obligation to calculate to offer a policy that hypothetically gives you exactly the cost of replacing your property if the home were to burn down, which would be an impossible standard, but assuming that's the standard, we have no evidence from Mr. Gottlieb about what he contends that amount would be. There's nothing in the record to say it would cost $317,000, it would cost $250,000. There's just nothing in the record. So particularly with the unjust enrichment claim, he can't demonstrate that he got this illusory coverage. He can't demonstrate that there was coverage sold to him that would never have been recovered if there was a total loss. Well, doesn't he say, even though he's not specifying the amount, he does say the rider, his reading of the rider is the rider specifies the procedure that has to be followed to set the amount. He says that procedure wasn't followed. Well, I guess that goes back to the first point. My reading of that in our argument here is that procedure sets, that endorsement, the rider, sets the procedure to be followed if there is going to be an intra-policy adjustment of the coverage date limit. It doesn't set the procedure if there's going to be a renewal policy offered with an increased limit. And that's what Judge Casper found. There was no intra-policy adjustment of the coverage day limit here. So the policy wasn't, the rider wasn't followed or not followed, it just didn't come into play here because there was no need to adjust that during either of the policy periods. Counsel, on the point that the record does not establish what the actual replacement cost might be in the event of total loss, he says your own material establishes that in the sense that you started for 2015-16, $311,000 is the value to replace the dwelling. The renewal policy that's increased by $10,000 to 321, when your own submissions to the Department of Insurance establish that the inflation rate is one point something, so that by your own calculations, you have overstated in that renewal policy what the actual replacement would be. So that establishes his proposition. He doesn't need to provide any evidence beyond that. What's wrong with that argument? There's a lot wrong with that argument, Your Honor. Stepping back, so this was first of all raised in the reply memo for the first time. It wasn't raised below, before Judge Casper, and it wasn't raised in their initial brief. What they're talking about is the rate filing that AMICA sends to the Division of Insurance. And AMICA's 30B6 witness testified that the purpose of that rate filing is to get rate changes approved by the Department of Insurance that are separate and distinct, I think it says above and beyond, increases in premium resulting from coverage A limits going up and down. So the document that they're referring to, which was referred to for the first time in their reply brief memo, they point to the record appendix at page 920 and 923. And they're referring to what's called annual trend or annual premium trend selection. And what AMICA explained, and this is explained in the brief, when you go to the Division of Insurance for the rate filing, you're saying to the Division of Insurance, here's our losses and expenses that have occurred across the board. And we need to either increase or lower our rates for these general losses and expenses. You're not saying, and this kind of goes back to the reasonableness of the way AMICA does this, it would be impossible to say, and we're going to increase all of our policies by 3.2%, so we want you to consider that as well. The reason that's impossible is AMICA makes those determinations on a zip code by zip code basis. So a home in Burlington where Mr. Gottlieb lives, they retain a third-party vendor, E2 Value, who looks at labor statistics, and they come back and say, okay, Burlington, you're at 3.2% increase for your coverage A limit for this policy year. Someone in Springfield might have 1.2% increase. Someone in Rehoboth might have 0.7% increase. So that figure, that 1% that was thrown out in the reply memo, is not talking about some statement by AMICA about the increase to reconstruction costs during that policy year. That's talking about increases to general losses and expenses that are applied across the board. Does that address the question? That was a question. I'm not sure I fully understand the answer, but I appreciate it. I've had to learn a lot about rate filings, too, so I can't say I'm an expert. And, you know, just the other issue, Your Honor, is I talked about the valuation not having any evidence of it. You know, even if this document with the rate filing was a suggestion that, you know, 1% was inflation, the record here establishes what AMICA did to calculate this $321,000 limit in the policy. Counsel, let me ask you this. This is just what I asked your opponent. You say every claim in this case hinges on the contractual constraints on AMICA in proposing the renewal policy. My sense was that that's not true of the unjust enrichment claim and the 93A claim. I mean, it seems to me there could be an extra contractual argument that AMICA in proposing a renewal policy that had the $321,000 value didn't base that on any legitimate method of reevaluation. It could have just pulled it out of the air. I know you didn't do that. So I don't understand why there isn't an independent unjust enrichment claim and a 93A claim apart from the contractual claim. Why do you say to the contrary? The reason I say that is because of how the complaint is pled. The complaint is very explicit about our unjust enrichment claim arises out of the failure to follow the endorsement in the 15-16, 16-17 policy. Aside from that, however, even if there was a potential freestanding unjust enrichment claim, here the policies plainly govern the relationship of the parties. And we know that not only because there's two policies and that's the only contracts between the parties. The testimony of Mr. Gottlieb in the brief, we asked him, did you pay AMICA for any other services besides this policy? He said no. Did you pay AMICA to calculate the replacement cost of your property? He says no. So the only relationship between the parties are the two policies that they entered into. And then alternatively, he has other, I guess this kind of overlaps with the first issue, but he has other available, if not viable, remedies. So I would say here we're at the summary judgment stage. I understand allowing unjust enrichment in Chapter 93A claim to go along co-committantly through discovery, but now we're at the summary judgment stage. And if there was a claim, there's an available claim under Chapter 93A, assuming that the unjust enrichment claim doesn't just mirror the breach of contract claim. So that would also dispose of the unjust enrichment claim. And then finally, kind of going back to my first point, if the idea is that there's an unjust enrichment claim that is separate from the policy, it's still premised on this idea that he bought a policy from AMICA. AMICA provided him $321,000 of insurance. He paid the premium for that insurance, and that was illusory insurance, or that was insurance he could never use. And there's no evidence of that. He paid a premium. If a loss had happened, AMICA would have provided him the coverage. They did everything they were supposed to do under the policy. That's the only exchange of money, is the payment of premium. And so, Your Honors, I think for that separate reason, the unjust enrichment claim would fail. If Your Honors have any other questions, I'm happy to answer them. But otherwise, we'll rest on the papers. Thank you. Thank you, Mr. Riley. At this time, Mr. Zavas, please reintroduce yourself on the record to begin. May it please the Court. I'm Attorney John Zavas again for Plaintiff Appellant Peter Gottlieb. I think maybe what the Court was leaning towards is best addressed that Record Appendix 0094, which is a cover letter to Peter Gottlieb from AMICA that accompanied his second policy, his 2016 and 2017 policy. The first sentence, first paragraph, our records indicate the coverage limit of your home needs to be adjusted. We are increasing your dwellage coverage to $321,000 in line with our estimate. Now, again, in this case, undisputed, there's only been one estimate, which is May 2015. Many factors went into estimating your dwelling limit. One of these factors is reconstruction costs. Reconstruction costs have risen steadily since our last survey back in 2015, one year ago, of your home. We state in our brief that that is a lie for a variety of reasons, including that wasn't reconstruction costs. In their depositions, AMICA conceded that they don't use actual inflation. They project it out into the future, and that's where the number 3.1 came from. So if you want to think about this as a fraudulent inducement case, as a kind of a version of 93A, I think that Record Appendix 0094 is right on point. But it also reinforces that back before this litigation started, AMICA viewed the two contracts the same way we did. This letter accompanying policy number 2 says, we're going to use our property valuation. Again, that goes back to March of 2015, the initial policy. So you don't have to somehow mesh the two contracts together or to say there's something in 2 that has to be in 1 in order for the plaintiff to prevail. 2 on its own terms, and as AMICA was kind enough to explain in their own cover letter, uses their own property valuation. There is no property valuation but the first one. So again, hypothetically, if Mr. Gottlieb had never entered into the first policy and only entered into the second, and AMICA had chosen not to do another property valuation in March 2015, everybody under the terms of the contract would have had to go back to March 2015 because that was the only one that existed. If you have any questions, if not, I will rest on that. Thank you. Thank you. That concludes arguments in this case.